UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
WILLIAM WHITWORTH,              )
                               )
            Plaintiff,         )   CIVIL ACTION NO.
                               )   11-10813-DPW
                               )
         v.                    )
                               )
TOWN OF CHELMSFORD and         )
JASON CALLAHAN,                )
                               )
            Defendants.        )
```

MEMORANDUM AND ORDER
March 11, 2013

Plaintiff William Whitworth seeks damages for the alleged use of excessive force against him by Town of Chelmsford police officer Jason Callahan.  Whitworth brought claims against the Town under 18 U.S.C. § 1983 (Count 1) and the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, § 4 (Count 2). Against Callahan, Whitworth brought a claim under 18 U.S.C. § 1983 (Count 3), as well as claims for intentional infliction of emotional distress (Count 4) and assault and battery (Count 5) under Massachusetts common law.  Whitworth lastly asserted a claim against both defendants under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I (Count 6). Defendants have moved for summary judgment, Dkt. No. 19.

Shortly before the summary judgment motion hearing in this matter, the parties stipulated to dismissal of Count 2 with

prejudice.  At the argument of the motion, plaintiff's counsel confirmed that he was not pursuing Counts 4 and 6.  I address defendants' motion for summary judgment on the remaining counts below.

## I. BACKGROUND

In the afternoon of October 19, 2008, William Whitworth ("Whitworth") and his wife Deborah received news from William McTighe's landlord that their daughter, Cara Harper, had been living with McTighe.  More troublingly, McTighe and Harper were fighting; the landlord reported that Harper was screaming and that she had been hurt.  The Whitworths had previously encouraged Harper to break things off with McTighe, whom they suspected abused her.  The Whitworths headed for McTighe's apartment and called the police.

Officer Jason Callahan arrived at the scene before the Whitworths.  The landlord directed Callahan to the entrance to McTighe's apartment, at the back of the residence.  Callahan began knocking on the door and identified himself as a police officer.  When the Whitworths arrived, they ran toward the apartment entrance at the back of the house.

Callahan, taken by surprise and unfamiliar with the plaintiff, greeted Whitworth with a forearm to the chest. Whitworth explained that he was Harper's father, but Callahan refused to enter the apartment until backup arrived.  Callahan

-2-

told Whitworth to wait along the side of the house.  Whitworth
complied, but started banging on the side of the house and
yelling for Harper and McTighe to open the door.  Officer Timothy
Bourke arrived and told Whitworth to stop.  At some point,
Whitworth's other daughter, Katelin Deschenes, also arrived on
the scene.

Harper, screaming and crying, at last opened the door.
Callahan entered, handcuffed McTighe, and spoke with him in a
separate hallway of the apartment.  Bourke, meanwhile, spoke with
Harper and her parents.  Harper remained hysterical, and began
arguing with her parents.  Sergeant Edward Quinn arrived and,
hoping to calm the commotion, asked the Whitworths to wait
outside the apartment.

For her part, Harper eventually calmed down.  She and
McTighe agreed the situation was a verbal dispute and neither
wanted to press charges.  McTighe made arrangements to leave for
the night, at which point he went outside to wait for his ride.
There, McTighe began taunting Whitworth and cursing at his wife.
In response, Whitworth ran to McTighe and grabbed him by the
collar of his sweatshirt.  McTighe dared Whitworth to hit him,
but Whitworth did not.

Callahan told Whitworth to let McTighe go, and struck
Whitworth on the forearm with his baton.  Whitworth did not let
go immediately, and the officers continued to try to pull

Whitworth off McTighe while ordering him to let go.  Within a few seconds, McTighe's sweatshirt ripped and Whitworth fell to the ground.  The officers then began hitting McTighe with their batons, while Whitworth crawled about ten feet away.

Once McTighe was subdued, Callahan ran back toward Whitworth while yelling "prone position, prone position," by which he meant to lie face down on the ground.  Deschenes remembered Whitworth saying "What? I don't know what that means," but Whitworth recounted that he "made no reply."  In any event, Whitworth remained on all fours, looking down at the ground.

Callahan then forced Whitworth to the ground, but the exact circumstances are not entirely clear.  Whitworth recounts that "I think maybe [Callahan] struck me [on the back right shoulder] more with his fist that he had the baton in and hit me with the butt of it."  Deborah Whitworth "couldn't see real clearly" but it appeared to her that Callahan "lifted some object and struck [Whitworth] on the back."  Harper, by contrast, only saw Whitworth being "pushed to the ground"; she saw that Callahan had a baton but thought he did not do anything with it.  Callahan, for his part, denies that he struck Whitworth at all.  He also testified at his deposition that he would not use the phrase "prone position" while giving a command in the field.

Either just before or after forcing Whitworth to the ground, Callahan climbed on his back and/or straddled him.  Whitworth

-4-

said, "Take it easy.  I'm no threat to you.  I'm not doing
anything."  Even after Whitworth was flat on the ground, Callahan
applied pressure to his back with both knees.  Deborah Whitworth
thought she heard Callahan say "I told you prone position."
Callahan handcuffed Whitworth behind his back; Whitworth
testified that the handcuffs were "very tight."

Whitworth declined medical assistance at the scene and again
after he was taken to the police station.  Criminal charges were
brought against both Whitworth and McTighe for assault and
battery and disorderly conduct, but Whitworth's case was
continued without a finding and ultimately dismissed.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment,
after adequate time for discovery and upon motion, against a
party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial."
*Celotex Corp*. v. *Catrett*, 477 U.S. 317, 322 (1986).  The question
is whether, viewing the facts in the light most favorable to the
nonmoving party, there is a "genuine dispute as to any material
fact."  Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc*. v.
*Mita Copystar Am., Inc*., 42 F.3d 668, 684 (1st Cir. 1994).

## III. ANALYSIS

In the interests of clarity in the discussion of the claims

at issue, I have reordered the consideration of the claims
presented in the several counts of the Complaint.

## A. *Section 1983 Claim against Officer Callahan (Count 3)*

The use of excessive force by police officers in the course
of an arrest or investigatory stop constitutes an unreasonable
seizure in violation of the Fourth Amendment, actionable under
section 1983. *Graham* v. *Connor*, 490 U.S. 386, 394 (1989).  The
Supreme Court has prescribed three considerations for evaluating
the objective reasonableness of a particular use of force: "[1]
the severity of the crime at issue, [2] whether the suspect poses
an immediate threat to the safety of the officers or others, and
[3] whether he is actively resisting arrest or attempting to
evade arrest by flight." *Graham*, 490 U.S. at 396.  I must
evaluate the reasonableness of the use of force at issue here
"from the perspective of a reasonable officer on the scene,
rather than with the 20/20 vision of hindsight, and must account
for the fact that police officers are often forced to make
split-second judgments in circumstances that are tense,
uncertain, and rapidly evolving about the amount of force that is
necessary in a particular situation." *Kenney* v. *Floyd*, 700 F.3d
604, 609 (1st Cir. 2012) (internal quotation and citation
omitted).

Although the extent of injury caused may be relevant, "a
trialworthy 'excessive force' claim is not precluded merely

because only minor injuries were inflicted by the seizure."
*Alexis* v. *McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d
341, 353 n.11 (1st Cir. 1995).  Rather, "[a]n officer's use of
force is unreasonable if, judging from the totality of the
circumstances at the time of the arrest, the officer uses greater
force than was reasonably necessary to effectuate the arrest."
*Phillips* v. *Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012).

Four key incidents form the basis of Whitworth's excessive
force claim: (1) the force used by Callahan to hit or block
Whitworth when Whitworth first came around the side of the house;
(2) the force used in separating Whitworth from McTighe, which
included Callahan using his baton to strike Whitworth in the
forearm and the officers pulling Whitworth off of McTighe and
"throwing" him to the ground; (3) the force used in getting
Whitworth into "prone position," which includes Callahan striking
Whitworth on the back, straddling him, and applying pressure to
his back with both knees; and (4) the overly tight handcuffing of
Whitworth by Callahan.  Although I must assess the totality of
the circumstances in order to determine whether excessive force
was used, the events are sufficiently discrete that individual
scrutiny is nevertheless useful to an understanding of the
totality.

1.  <u>Forearm to the Chest</u>

Callahan striking Whitworth in the chest when Whitworth

first arrived at the house presents no Fourth Amendment issue.
Callahan was taken by surprise when Whitworth, in an excitable
state as a result of concern about his daughter, ran around the
side of the house.  Because Callahan did not know who Whitworth
was, he struck or blocked Whitworth with his forearm.  Whitworth
himself admitted he understood why Callahan did this, and that he
"had no problem" with it.  It was not unreasonable under the
circumstances.

####    2.  Separating Whitworth and McTighe

Neither was there an excessive use of force in separating
Whitworth from McTighe.

Whitworth argues that Callahan did not even give him a
chance to respond to his command to let go of McTighe.  Exactly
how many times the officers told Whitworth to let go of McTighe
before resorting to force is in dispute.  But, taking the facts
most favorably to Whitworth, as I must at this stage, I accept
Whitworth's characterization that Callahan struck him on the
forearm "almost simultaneously" with the command to let go of
McTighe.

All involved, however, had just emerged from what even
Whitworth described as an "intense situation."  In response to
McTighe's taunting remarks directed at Whitworth and derogatory
remarks directed at his wife, Whitworth initiated
the physical confrontation by running over and grabbing McTighe.

-8-

Whitworth was 55 years old at the time of the incident, but there
is no indication that he was physically weak.  Indeed, the
officers were required to pull Whitworth from McTighe--with
McTighe's sweatshirt ultimately ripping.  And even though
Whitworth did not hit McTighe, the officers reasonably perceived
that Whitworth posed an imminent threat of harm--not just to
McTighe, but also to themselves if a fight broke out between
Whitworth and McTighe.

Whitworth has admitted that he did not immediately let go of
McTighe after Callahan struck him.  Yet, even if the officers
were less than perfectly patient with Whitworth about heeding the
command to let go of McTighe, they reasonably perceived that
Whitworth was being less than fully cooperative.

Finally, the level of force used was appropriate under the
circumstances.  Although Callahan applied significant force,
Callahan testified at his deposition that he struck plaintiff on
the forearm because he understood it to be a "safe zone," where
he could strike Whitworth in hopes of separating him from McTighe
without inflicting serious injury.  This action was not
unreasonable.

### 3.   Events Leading Up to Handcuffing

The events leading up to Callahan handcuffing Whitworth, by
contrast, raise a genuine issue of fact as to whether Callahan
used excessive force in making the arrest.  Because an excessive

-9-

force determination "requires careful attention to the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396, the broad range of unresolved factual issues here precludes summary judgment.

For example, the precise timeframe is unclear. McTighe's landlord testified that about a minute passed between the end of the Whitworth-McTighe confrontation and Whitworth sitting on the ground to be handcuffed. Deborah Whitworth, however, estimated that it took the officers three or four minutes just to subdue McTighe before Callahan turned his attention back to her husband. In either case, it is not clear how long the pre-handcuffing interaction between Callahan and Whitworth lasted, or whether the commotion from the earlier confrontation had subsided by that time.

More importantly, unresolved are issues such as: what Callahan said as he approached Whitworth to handcuff him; whether Callahan actually struck Whitworth with his baton or struck him at all; if Callahan merely pushed Whitworth and how forcefully he did so; and whether Callahan continued to apply pressure to Whitworth's back, using both knees, even after Whitworth was flat on the ground.

Viewing the facts most favorably to the plaintiff, Whitworth was entirely submissive at this stage of the incident. Specifically, Whitworth was in a non-threatening position on all

-10-

fours when Callahan engaged him, and tried to express to Callahan
that he did not understand the command "prone position."

Callahan argues that some force was justified because he
thought Whitworth was refusing to obey his command.  But a
reasonable officer should have known that "prone position" likely
would not be understood by a lay person, or should have attempted
a different command (*e.g.*, "lay down on the ground") before
resorting to force.  Any argument that Callahan made an honest
mistake in using the phrase "prone position" reduces to an
argument that the command and reaction to Whitworth's perceived
disobedience were made in good faith.  Such arguments about
subjective intent, however, are not relevant to the Fourth
Amendment reasonableness inquiry.  *Graham*, 490 U.S. at 397
("whether the individual officers acted in 'good faith' or
'maliciously and sadistically for the very purpose of causing
harm,' is incompatible with a proper Fourth Amendment analysis").

Moreover, even if Whitworth were not obeying a direct
command to lay on the ground, it is not clear that the force used
would have been necessary--assuming, again, that Whitworth was
otherwise in a non-threatening position and that Callahan, rather
than responding with a push or a shove, responded by jumping on
Whitworth's back and applying pressure with both knees.  A jury
must hear the testimony of those present, make the necessary
credibility determinations, and find the facts as to what

transpired before I can conduct an independent assessment of the reasonableness of any use of force. *Phillips*, 678 F.3d at 520 ("while we accept the factual inferences made by the jury, we must independently review the jury's interpretation of what is reasonable under the Fourth Amendment").

For similar reasons, arguments about qualified immunity are premature.  True, qualified immunity "protect[s] officers from the sometimes hazy border between excessive and acceptable force." *Mlodzinski* v. *Lewis*, 648 F.3d 24, 33 (1st Cir. 2011) (internal quotation and citation omitted).  But determining whether the use of force falls into a legal grey area again depends first on finding the relevant facts.  As the Supreme Court has explained:

> If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would [under *Graham*] be justified in using more force than in fact was needed.  The qualified immunity inquiry's concern, on the other hand, is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  An officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.

*Saucier* v. *Katz*, 533 U.S. 194, 195 (2001), *abrogated in part on other grounds by Pearson* v. *Callahan*, 555 U.S. 223 (2009).  At this stage, too little is settled about what transpired, what an officer in Callahan's position might reasonably have perceived, and what level of force was used.  Only after those uncertainties are resolved by trial development of evidence can I assess

whether Callahan made a reasonable mistake as to the legality of his use of force.

### 4.   Handcuffs

That Callahan handcuffed Whitworth too tightly does not appear to be a basis, in itself, for an excessive force claim--particularly when Whitworth made no complaint about the handcuffs at the scene and declined medical attention several times. *Cf. Lyons* v. *City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005) (excessive force claim based on handcuffing requires physical injury and that officers ignored complaints that handcuffs were too tight); *Glenn* v. *City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) ("handcuffing too tightly, without more, does not amount to excessive force").  That said, the manner in which Whitworth was handcuffed may round out the totality of the circumstances relevant to assessing whether excessive force was used.  For example, the jury may use the manner in which Whitworth was handcuffed to draw inferences about how roughly he was treated over the course of the arrest, and in particular during the sequence of events just prior to the handcuffing.

### 5.   Conclusion

Given the genuine issues of material fact concerning the use of force during the events following the separation of Whitworth and McTighe and before the handcuffing of Whitworth, I decline to

grant defendant summary judgment on this aspect of the section
1983 claim against Callahan.

**B.  *Assault and Battery against Officer Callahan (Count 5)***

Whitworth's section 1983 and assault and battery claims rise
and fall together.  "Where a plaintiff alleges both a § 1983
excessive force claim and common law claims for assault and
battery, our determination of the reasonableness of the force
used under § 1983 controls our determination of the
reasonableness of the force used under the common law assault and
battery claims."  *Raiche* v. *Pietroski*, 623 F.3d 30, 40 (1st Cir.
2010); *accord Dean* v. *City of Worcester*, 924 F.2d 364, 369 (1st
Cir. 1991).  Having concluded I must deny summary judgment as to
the section 1983 claim against Callahan, *see* Part III.A5 *supra*, I
must also deny summary judgment as to the assault and battery
claim.

**C.  *Section 1983 Claim against Town of Chelmsford (Count 1)***

I next turn to Whitworth's section 1983 claim against the
Town of Chelmsford.  Under *Monell v. Dep't of Soc. Servs.*, 436
U.S. 658 (1978), municipalities may be held liable under section
1983 "when execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy, inflicts the injury."  *Id.*
at 694.  The Court has also held that "[o]nly where a failure to
train reflects a 'deliberate' or 'conscious' choice by a

municipality . . . can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

Whitworth does not take issue with the Town's stated policies.  In fact, he says Callahan violated the Town's stated policy as to the circumstances under which the Town sanctions use of a baton.  Instead, Whitworth relies upon what he contends was an unconstitutional "custom" at the Chelmsford police department--including indifference toward other unconstitutional conduct, particularly Callahan's, and prevailing attitudes among officers at the department.

The First Circuit has endorsed two requirements for a section 1983 action grounded upon unconstitutional municipal custom:

> First, the custom or practice must be attributable to the municipality.  In other words, it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. . . . Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights.

*Bordanaro* v. *McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989).

"Tolerance of unconstitutional conduct is tantamount to encouragement of such conduct and is therefore a basis for municipal liability."  *Foley* v. *City of Lowell*, 948 F.2d 10, 14-15 (1st Cir. 1991) (internal quotation and citation omitted).

Whitworth says one need look no further than the day of the incident to find municipal indifference to unconstitutional use of force.  For example, the officers hit McTighe with their batons after pulling him apart from Whitworth, which Whitworth argues also constituted excessive force.  Whitworth also reports that, at the police station following the incident, he heard Lieutenant James Spinney say to Callahan "What the f--k happened here?  Everything was under control."  Whitworth says this statement indicates Spinney knew Callahan had used excessive force, but did nothing about it.

Putting aside that McTighe has not taken issue with the force used against him by the other officers, and that all the officers were attempting to prevent a full-fledged fight from breaking out between McTighe and Whitworth, the force used over the course of the same incident cannot itself establish a "well settled and widespread" custom.  Spinney's statement also implies nothing about the level of force deployed by Callahan; rather, the statement most naturally questions how, after the officers had neutralized the fight between McTighe and Harper, the subsequent fight between McTighe and Whitworth broke out.[1]

---

[1]Defendants also move to strike the paragraph of Whitworth's affidavit in which he recounts Spinney's statement.  Dkt. No. 30. They argue that Whitworth does not explain why he failed to mention the statement at his deposition.  Although an explanation would be required if the statement contradicted "clear answers to unambiguous questions" in his deposition, *Colantuoni* v. *Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4 (1st Cir. 1994), no such obvious contradiction is present here.  Whitworth was asked about

Whitworth also points to a subsequent November 7, 2008 incident in which Callahan took a teenager to the ground even though he had already been handcuffed.  Whitworth faults the department for failing to conduct a formal investigation into Callahan's behavior.  But the other officer at the scene reported concern about Callahan's behavior to Lieutenant Spinney. Spinney, in turn, filed a formal report expressing the view that Callahan needed to "calm down," particularly when an individual posed no threat.  He also discussed these concerns with Callahan. Eventually, sometime "close to 2010," Spinney also asked another officer to oversee Callahan's activities.

Far from indicating indifference to excessive use of force--let alone at the policymaking level--the response by other officers at the department indicates an awareness that department policy and custom did not sanction excessively aggressive behavior, and reflects some reasonable steps taken to ensure that

---

all conversations he had with officers on the day of the incident, all conversations he had with McTighe on he day of the incident, and whether he recounted, as best he could, the details of the incident itself.  He was never asked to provide (and gave no assurance that he had) comprehensively recounted every detail of every event that day, including every exchange between any officers present at any point that day.

Defendants also argue that the statement is inadmissible hearsay, but this is nonsense given that the statement is not offered for the truth of the matter asserted.  Defendants finally say that Whitworth lacked personal knowledge of Spinney's statement and imply that Callahan might not have even been at the station; but Callahan himself confirmed he was present during the booking process.

For these reasons, defendants' motion to strike must be denied.

such behavior was kept in check.  Moreover, given that any
evidence of impropriety is limited to these few incidents--both
dealing specifically with Callahan--Whitworth has failed to
adduce evidence of practices at the time of Callahan's encounter
with Whitworth so pervasive that they amount to deliberate
indifference at the policymaking level to the constitutional
rights of those with whom the police come in contact.  *Compare
Bordanaro* v. *McLeod*, 871 F.2d 1151, 1158-59 (1st Cir. 1989)
(municipal liability rooted in wide variety of faults in training
and supervision, including decades-old department regulations,
lack of continuing training, and discouragement of supplemental
training).

Whitworth finally seeks to prove a custom of use of
excessive force based on Bourke's acknowledgment that officers at
the department used the phrase "We club 'em, we own 'em."  Bourke
testified at his deposition, however, that the saying means "if
you use that amount of force [*i.e.*, a baton strike], you'd better
have a good reason for doing it and you'd better make an arrest."
Mere speculation that the phrase has some more insidious meaning
does not raise a genuine issue of fact as to a municipal custom
of indifference toward constitutional rights.  Much the same can
be said of Whitworth's observation that the Town of Chelmsford
has not sustained a citizen complaint of excessive force since
1998.  This fact fails to support a custom of indifference to

constitutional rights without some indication that legitimate excessive force claims were ignored.

### IV. CONCLUSION

For the reasons set forth more fully above, with Counts 2, 4 and 6 no longer being pursued by plaintiff, I conclude that of the remaining counts, defendants' motion for summary judgment (Dkt. No. 19) is GRANTED as to Count 1 and DENIED as to Counts 3 and 5. Defendants' motion to strike (Dkt. No. 30) is DENIED.

_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT